SLT:AHT
F.#2013R00571

**13M814**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

AKBAR AHMED SHERZAI,

          Defendant.

- - - - - - - - - - - - - - - -X

SUBMITTED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      JAMES GRATHWOHL, being duly sworn, deposes and states that he is a Special Agent with Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

      Upon information and belief, on or about and between April 1, 2013 and May 31, 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AKBAR AHMED SHERZAI, together with others, did knowingly and intentionally conspire to corruptly give, offer or promise a thing of value to a public official or person who has been selected to be a public official with intent to influence an official act.

      (Title 18, United States Code, Sections 371 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been employed by HSI for 20 years. Currently, I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for money laundering and other financial crimes. During the course of my duties and investigations, I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where records of criminal activity have been found; (c) reviewed and analyzed numerous recorded conversations and other documentation of criminal activity; (d) debriefed cooperating defendants and confidential human sources; (e) monitored wiretapped conversations, and (f) conducted surveillance of individuals engaged in white collar crimes. I have participated in investigations involving search warrants and arrest warrants.

2. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from cooperating witnesses and (c) information obtained from other law enforcement agents. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted

for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.

PROBABLE CAUSE FOR ARREST

3. HSI and the International Contract Corruption Task Force ("ICCTF") -- comprised of the Office of Special Inspector General of Afghanistan Reconstruction ("SIGAR") and the Federal Bureau of Investigation ("FBI") -- have been conducting a criminal investigation into the fraudulent processing of failed fuel delivery missions as successful and completed fuel delivery missions, which would qualify for full payments from the United States Government ("USG") in Afghanistan.

4. In or about April 2013, a U.S. military noncommissioned officer (hereinafter, "CW") reported to SIGAR that the defendant AKBAR AHMED SHERZAI, a contractor in Afghanistan who is a trucking company representative, requested assistance from CW in obtaining improper payments for unpaid fuel delivery missions to U.S. military installations. SHERZAI

informed CW that SHERZAI would "make it worth (CW's) while" if CW assisted SHERZAI with the fraudulent processing of failed fuel delivery missions.

5. Following this initial conversation, on or about April 14, 2013, CW met with the defendant AKBAR AHMED SHERZAI on Camp Pratt in Mazar-i-Sharif, Afghanistan, to further discuss the assistance that SHERZAI was seeking from CW. During the meeting, SHERZAI provided CW with a list of transportation movement requests ("TMRs") -- official forms that the U.S. military uses to document the delivery of fuel -- that SHERZAI wanted CW's assistance in getting approved so that payment would be made to SHERZAI's company.

6. On or about April 21, 2013, the defendant AKBAR AHMED SHERZAI and CW met on Camp Marmal in Mazar-e-Sharif, Afghanistan to further discuss the TMRs that SHERZAI previously provided to CW, as well as an additional TMR that SHERZAI brought to the meeting. CW explained to SHERZAI that the fuel was never delivered for the TMRs that SHERZAI provided and were thus categorized as "no-show" missions. When CW advised SHERZAI that trying to get TMRs approved for "no-show" missions was risky, SHERZAI told CW to "take care of it." CW then asked SHERZAI "What about me?" to which SHERZAI responded, "Of course, man, I told you, one hand washes the other." CW then asked how much he would be paid for "taking care of" the TMRs. SHERZAI

5

explained that if there were records that accompany the TMR, he would pay CW $2,500 per approved TMR. SHERZAI then explained that, if there were no records related to the TMR, the fuel was, in fact, stolen. In that circumstance, SHERZAI explained to CW that he would pay CW $4,000 for each fraudulently approved TMR.[1] CW asked SHERZAI what would happen after CW showed that SHERZAI's TMRs had been received and processed. SHERZAI stated, "You tell me where you want it [...] You want it in cash, you got cash. You want it sent somewhere, it'll be sent there [...] This is going to be a long term relationship." SHERZAI indicated that he believed that CW's assistance would prevent the imposition of $675,000 in penalties by the U.S. military.

7. On or about April 24, 2013, CW called the defendant AKBAR AHMED SHERZAI and discussed a TMR for which fuel had been legitimately delivered. CW advised that SHERZAI did not have to worry about paying CW for that TMR because it was a valid delivery. SHERZAI then asked CW to concentrate on four TMRs that they had discussed during their prior meeting. CW advised that they may have to falsify the TMRs because CW could not find anything to indicate that the fuel was received. SHERZAI agreed with CW.

---

[1] The U.S. military charges contractors such as the defendant AKBAR AHMED SHERZAI a $75,000 penalty for each failed fuel delivery mission.

8. On or about April 27, 2013, CW called the defendant AKBAR AHMED SHERZAI and advised that CW would have three of the four fraudulent TMRs ready the following day. CW advised SHERZAI that the total owed for the three falsified TMRs was $12,000. SHERZAI stated that he would bring the money into Camp Marmal with him.

9. On or about April 28, 2013, the defendant AKBAR AHMED SHERZAI and CW met in Camp Marmal and CW provided three TMRs -- all of which falsely indicated that the fuel was delivered -- to SHERZAI. After SHERZAI reviewed the three TMRs, SHERZAI stated that everything was "perfect" and provided CW with $12,000 in cash. SHERZAI then stated that he had additional TMRs that he needed CW to process. SHERZAI provided CW with three personal email accounts and told CW to use one of those accounts to communicate to SHERZAI how to deliver the money. SHERZAI stated to CW, "I told you, you take care of me, I take care of you."

10. On or about May 2, 2013, CW called SHERZAI to provide SHERZAI with an email account that SHERZAI could use to contact CW (the "CW Email Account") in the future. During that conversation, SHERZAI told CW there were ten additional TMRs that SHERZAI wanted CW to falsify to reflect that fuel had been delivered. SHERZAI advised CW that he would send the TMRs to CW's Email Account.

7

11. On or about May 5, 2013, the defendant AKBAR AHMED SHERZAI sent an email from his Gmail Account to the CW Email Account which included four TMRs discussed during the May 2, 2013 call. In the email, SHERZAI stated, "I will send the other 9 that we talked about in next hour."[2] Later that same day, SHERZAI sent another email from his Gmail Account to the CW Email Account, in which SHERZAI stated, "Here is the 9 TMRs that we talked about. please see what you can do. every thing will remain the same and the point of contact will be me."

12. On or about May 6, 2013, an email was sent from the CW Email Account to the defendant AKBAR AHMED SHERZAI's Gmail Account to inquire whether SHERZAI would be able to meet CW at Bagram Airfield ("BAF") in Afghanistan concerning the thirteen TMRs that were sent via email the previous day. The next day, SHERZAI sent an email from his Gmail Account to the CW Email Account in which SHERZAI stated that he was available to meet at BAF and to "let me know how you want to handle the stuff that I am to give you.it will be a lot."

13. On or about May 8, 2013, an email was sent from the CW Email Account to the defendant AKBAR AHMED SHERZAI's Gmail Account to discuss dates for the meeting at BAF. In the

---

[2] The portions of the emails sent by the defendant AKBAR AHMED SHERZAI that are quoted in this Complaint are intended to reflect the defendant's actual words as closely as possible, including any and all spelling, grammatical or punctuation errors.

Case 1:14-cr-00060-MKB Document 1 Filed 09/18/13 Page 8 of 11 PageID #: 8

8

email, CW told SHERZAI that "As far as the stuff to give me. It is a lot. Would it be possible to have someone give that to a family member of mine in New York City? My brother in law lives there. [...] The bottom line is that all nine of the TMRs are no-shows. I will prepare memos for all nine of the TMRs so no worries on this. I am still working on the other four as well." Later that day, SHERZAI responded with an email, in which SHERZAI stated "your thing to NEW YORK should not be a problem. but it has to be in increments can not be done all at once. is that ok with you???. I will send it personaly. it will be ready when you come to BAF."

14. On or about May 9, 2013, an email was sent from the CW Email Account to the defendant AKBAR AHMED SHERZAI's Gmail Account, in which CW suggested that CW and SHERZAI meet on May 13, 2013 at BAF and advised that 11 of the 13 TMRs were "no-show" missions. The remaining two TMRs were still being reviewed by the CW and SHERZAI did not need to bring money for those two. Later that day, SHERZAI responded to CW's email and confirmed that he could meet CW at BAF on May 13, 2013.

15. On or about May 13, 2013, CW and the defendant AKBAR AHMED SHERZAI met at BAF. CW advised SHERZAI that CW had falsified 11 of the TMRs to make it appear that the fuel had been delivered when, in fact, each were "no-show" missions. CW and SHERZAI agreed that SHERZAI owed CW $44,000 for falsifying

the 11 TMRs to reflect that fuel had been delivered and began discussing delivery of the payment. SHERZAI suggested to CW that CW's brother-in-law would be able to receive the money for the transaction through an informal money transferring system commonly known as "hawala." SHERZAI explained that the payments had to be sent in increments of less than $10,000 per day. SHERZAI explained that, with a larger sum, "there are people looking" and $10,000 "hits the radar" and is tracked, but "anything below shouldn't be a problem." CW inquired whether the hawala system is like Western Union, or under the table and SHERZAI responded, "Under the table." SHERZAI explained that there is a 4% fee to send the money from Afghanistan to the United States through the hawala system, but that it was safe because neither SHERZAI's name nor CW's name would be associated with the transaction. SHERZAI told CW that he brought $40,000 as payment, but CW responded that CW could only take $10,000 in cash at that time. CW then drove to SHERZAI's vehicle, where SHERZAI retrieved a bag that contained $10,000 and gave the money to CW.

16. On or about and between May 13, 2013 and May 24, 2013, CW and the defendant AKBAR AHMED SHERZAI exchanged a series of emails in which they discussed delivering the remaining $34,000 to CW's brother-in-law in New York City.

17. On or about May 24, 2013, CW and the defendant AKBAR AHMED SHERZAI had a telephone conversation. During that conversation, SHERZAI explained that he was having difficulty sending CW's money to the United States for delivery to CW's brother-in-law. SHERZAI discussed a variety of possibilities, and stated that one option was to send the money to SHERZAI's brother in Virginia, who would then deliver the money to CW's brother-in-law in New York.

18. On or about May 26, 2013, the defendant AKBAR AHMED SHERZAI sent an email from SHERZAI's Gmail Account to the CW Email Account and explained, "I have been going nuts, all avenues have been blocked, I had to go through California to get it in today. it will be send to VA. then some one will take it to NY. I need His Telephone number to be able to contact him. this is completely one time deal. for the future I have to find other ways and means first. the charges have been 2 stuff to be delivered to NY. sorry about that I did not know it would be that much. It should arrive there by thursday or latest friday."

19. On or about Friday, May 31, 2013, in Brooklyn, New York, an individual, later identified as the defendant AKBAR AHMED SHERZAI's brother, met with an undercover law enforcement agent posing as CW's brother-in-law and gave the undercover law enforcement agent $32,000 in cash.

20. Because public filing of this document could result in a risk of flight by the defendants, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that the defendant AKBAR AHMED SHERZAI be dealt with according to law.

_____
JAMES GRATHWOHL
Special Agent
Homeland Security Investigations

Sworn to before me this
18th day of September, 2013

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK