

U.S. Department of Justice

United States Attorney
Eastern District of New York

AHT
F. #2013R00571

271 Cadman Plaza East
Brooklyn, New York 11201

April 29, 2015

By ECF

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

              Re:    United States v. Akbar Sherzai
                     Criminal Docket No. 14-CR-60 (MKB)

Dear Judge Brodie:

      The government respectfully submits this letter in connections with the defendant's sentencing, which is currently scheduled for April 30, 2015. For the reasons stated below, the government respectfully submits that a sentence of imprisonment within the applicable Sentencing Guidelines range is appropriate in this case.

I.      Background

      Beginning in 2013, Homeland Security Investigations (HSI) and the International Contract Corruption Task Force (ICCTF), comprised of, among others, the Office of Special Inspector General of Afghanistan Reconstruction and the Federal Bureau of Investigation, conducted a criminal investigation into the fraudulent processing of failed fuel delivery missions as successful and completed fuel delivery missions, which would qualify for full payments from the U.S. Government in Afghanistan.

      In April 2013, a U.S. military noncommissioned officer (the "Officer") reported to SIGAR that the defendant, a contractor in Afghanistan who was a representative for APL, a trucking company, requested assistance from the Officer in obtaining improper payments for unpaid fuel delivery missions to U.S. military installations. The defendant informed the Officer that the defendant would "make it worth [the Officer's] while" if the Officer assisted the defendant with the fraudulent processing of failed fuel delivery missions.

1

Following this initial conversation, on April 14, 2013, the Officer met with the defendant on Camp Pratt in Mazar-i-Sharif, Afghanistan, to further discuss the falsification of documents in connection with failed fuel deliveries. During the meeting, the defendant provided the Officer with a list of transportation movement requests (TMRs), official forms that the U.S. military uses to document the delivery of fuel, that the defendant wanted the Officer to falsify to reflect successful deliveries so that payment would be made to the defendant's company. By contrast, if the fuel deliveries were not made and the TMRs were not falsified, the defendant's company would be fined $75,000 per failed load of fuel.[1]

The Officer explained to the defendant that the fuel was never delivered for the TMRs that the defendant provided and were thus categorized as "no-show" missions. When the Officer advised the defendant that trying to get TMRs approved for "no show" missions was risky, the defendant told the Officer to "take care of it." The Officer then asked the defendant "What about me?" to which the defendant responded, "Of course, man, I told you, one hand washes the other." The Officer then asked how much he would be paid for "taking care of" the TMRs. The defendant explained that he would pay the Officer $2,500 per approved TMR. The defendant then explained that, if there no were records related to the TMRs, the fuel was, in fact, stolen. In that circumstance, the defendant explained to the Officer that he would pay the Officer $4,000 for each fraudulently approved TMR. The defendant indicated that he believed the Officer's assistance would prevent the imposition of at least $75,000 in penalties by the U.S. military per failed delivery.

As detailed further in the PSR, in April and May 2013, the defendant and the Officer had a series of communications in which they discussed the falsification of TMRs to reflect successful deliveries and the payment to the Officer for falsifying the documents. On April 28, 2013, the defendant and the Officer met in Camp Marmal and the Officer provided three TMRs, all of which falsely indicated that the fuel was delivered, to the defendant. All of these TMRs reflected fuel deliveries that were to be made by the defendant's company. After the defendant reviewed the three TMRs, the defendant stated that everything was "perfect" and provided the Officer with $12,000 in cash. The defendant then stated that he had additional TMRs that he needed the Officer to process. The defendant provided the Officer with three personal email accounts and told the Officer to use one of those accounts to communicate to the defendant how to deliver the money. The defendant stated to the Officer, "I told you, you take care of me, I take care of you."

On May 2013, the defendant provided 11 additional TMRs that the defendant wanted the Officer to falsify to reflect that fuel had been delivered even though U.S. Army

---

[1] Under the National Afghanistan Trucking fuel contract, Afghan companies are paid to transport U.S. Government-owned fuel between U.S. military bases in Afghanistan. When a company picks up fuel from the initial base, but does not show ("no-show"), or fails to deliver the fuel to the receiving base, the U.S. Government charges the company $15 per gallon. Therefore, for a 5,000-gallon truck, the company is charged $75,000 for a no-show or failed delivery.

2

paperwork indicated that the missions were no-show missions. Notably, of those 11 additional TMRs, only two reflected fuel deliveries that were to be made by the defendant's company. The other nine TMRs reflected fuel deliveries that were to be made by other subcontractors. As part of the government's investigation, the Officer agreed to falsify the documents.

On May 13, 2013, the Officer and the defendant met at Bagram Airfield. The Officer advised that he had falsified 11 of the TMRs to make it appear that the fuel had been delivered, when, in fact, each were no-show missions. The Officer and the defendant agreed that the defendant owed the Officer $44,000 for falsifying the 11 TMRs and began discussing delivery of the payment. The defendant suggested to the Officer that the Officer's brother-in-law would be able to receive the money for the transaction through an informal money transferring system commonly known as "hawala." The defendant explained that the payments had to be sent in increments of less than $10,000 per day.

The defendant explained that, with a larger sum, "there are people looking" and $10,000 "hits the radar" and is tracked, but "anything below shouldn't be a problem." The Officer inquired whether the hawala system is like Western Union, or under the table and the defendant responded, "Under the table." The defendant explained that there is a 4% fee to send the money from Afghanistan to the United States through the hawala system, but that it was safe because neither the defendant's name nor the Officer's name would be associated with the transaction. The defendant told the Officer that he brought $40,000 as payment, but the Officer responded that the Officer could only take $10,000 in cash at that time. The Officer then drove to the defendant's vehicle, where the defendant retrieved a bag that contained $10,000 and gave the money to the Officer.

In later conversations, the defendant and the Officer discussed delivering the remaining $34,000 to the Officer's brother-in-law in New York City. The defendant discussed a variety of possibilities, and stated that one option was to send the money to the defendant's brother in Virginia, who would then deliver the money to the Officer's brother-in-law in New York. On May 31, 2013, in Brooklyn, New York, the defendant's brother met with an undercover law enforcement agent posing as the Officer's brother-in-law and gave the undercover law enforcement agent $32,000 in cash.

Once this cash delivery had been made, the defendant sought to have the Officer falsify 29 additional TMRs, all of which reflected fuel deliveries for which non-APL contractors were responsible. As part of the government's ongoing investigation, the Officer agreed to falsify the 29 TMRs. As per their original agreement, the defendant agreed to pay $4,000 for each falsified TMR, for a total of $116,000. The defendant never consummated these bribes, however, because the repayment of the fine on the original 14 falsified TMRs described above were never made.[2]

---

[2] In the PSR, Probation calculated restitution in the amount of $1.05 million. However, this calculation was based on the premise that the U.S. Army did not charge the fines associated with the failed fuel deliveries to the relevant contractors. In fact, the U.S.

On September 19, 2013, the defendant was arrested. In his post-arrest statements, the defendant told investigators that he was aware of the penalties for non-delivery of the aforementioned fuel under the fuel contract. The defendant also indicated that he knew the Officer and stated that he bribed the Officer to falsify TMRs for "no show" missions.

On February 14, 2014, the defendant pled guilty, pursuant to a plea agreement, to the single-count of an information that charged that between April 1, 2013 and September 24, 2013, the defendant knowingly and intentionally bribed a public official, in violation of 18 U.S.C. §§ 201(b)(1)(A), 201(b)(1)(C). See PSR ¶ 1.

## II.     The Defendant's Guidelines Calculation

The PSR calculates the defendant's applicable advisory sentencing range under Guidelines to be 70 to 87 months' imprisonment, based on an offense level of 27 and a Criminal History Category of I. See PSR ¶¶ 26-35, 38-39 and 62. Probation's calculation of the advisory Guidelines range mirrors the estimate provided by the government in the Plea Agreement.

The defendant offered the Officer $54,000 in bribe money for the receipt of 14 falsified TMRs. For each occasion the defendant failed to deliver fuel, his company would have been fined $75,000, or a total of $1.05 million dollars (i.e. 14 x $75,000). Since the defendant offered and paid bribes to the Officer for the purpose of evading a fine, the "benefit received" for guideline purposes would be the total fine that the defendant did not have to pay. Therefore, the defendant is accountable for the benefit received of $75,000 for each falsified TMR.

The defendant has maintained that, of the 14 TMRs that he bribed the Officer to falsify, the five that were related to fuel deliveries that APL was responsible for were, in fact, actually delivered. However, the defendant concedes that he did not know whether the other nine TMRs reflected successful deliveries. Although U.S. Army paperwork reflects that none of the 14 deliveries were successfully made, the government does not seek to prove at a Fatico hearing that all 14 TMRs were failed deliveries, and in the interest of moving forward to sentencing, the government accepts the defendant's stipulation to an intended loss amount of $675,000 (i.e. 9 x $75,000) and a corresponding 14-point enhancement. U.S.S.G. § 2B1.1(b)(1)(I). As a result, the government respectfully submits that the defendant's adjusted offense level should be 25 and the applicable advisory Guidelines range should be 57 to 71 months' incarceration.

---

Army automatically debited the fines from those companies' accounts, and although the defendant's bribery scheme was designed to recoup those debits, as part of the government's investigation, the fines were never returned to the contractors. Because the fines that were levied on APL and two other companies were never repaid to them, the U.S. Army suffered no actual loss and there is no need for restitution in this case.

4

III.     A Sentence Within the Applicable Guidelines Range Is Appropriate

A sentence within the advisory Guidelines is appropriate in this case. The offense conduct is extremely serious and a sentence within the advisory Guidelines range would promote respect for the law and deter others from committing similar crimes.

The seriousness of the defendant's offense cannot be overstated. Although the primary factor in determining the defendant's applicable Guidelines range is the amount of the intended loss, the amount of the intended loss – although significant – reflects only the monetary aspect of the defendant's egregious conduct. Simply put, the defendant sought to use deception, corruption and greed to enrich his company and others at the risk of jeopardizing the U.S. Army's supply lines in Afghanistan. In addition to the amount of money involved in the intended loss and the corrosive effect of government corruption, the defendant sought to compromise the integrity of the U.S. Army's record-keeping system. Had he been successful, he would have potentially compromised the safety of Army personnel at the various bases that the fuel was to be delivered. The U.S. Army relies on TMRs to determine how much fuel each base possesses, and the defendant's bribery scheme would have led the Army to believe that its installations throughout Afghanistan had 45,000 gallons of fuel that they did not, in fact, have.

Furthermore, this wartime fraud scheme is serious because of the harm that crimes like the defendant's inflict on the integrity of the government procurement system. Whether it is in the form of bribes, gratuities, hidden conflicts-of-interest, kickbacks, or the disclosures of information that should not be disclosed, corruption of the procurement process makes it more difficult to attract honest contractors in the future and negatively affects the market in which contractors make competitive bids. See United States v. Purdy, 144 F.3d 241, 244 (2nd Cir. 1998) ("Kickback activity corrupts the Federal procurement system. It drives out honest competitors and destroys the market in which the government must bargain.") Because the federal procurement system awards contracts worth billions of dollars each year, any case that harms the integrity of that system is serious.

In the defendant's sentencing memorandum, dated April 27, 2015, he contends that he did not personally profit from any of these transactions. See Def.'s Letter at 3. This claim, even if true,[3] does not detract from the seriousness of the crime. Indeed, regardless of any

---

[3] In his interview with the Probation officer in connection with preparation of the PSR, the defendant indicated that "[w]henever the defendant's company was noted as not appearing with a delivery, his company would be billed $75,000 by the U.S. military, and if not paid within four days, the amount would be deducted from the defendant's pay." PSR ¶ 30. Thus, it is clear that the defendant's motivation to bribe the Officer to falsify TMRs was borne, at least in part, from his own financial considerations. Furthermore, nine of the TMRs that the defendant bribed the Officer to falsify reflected fuel deliveries to be made by other companies, which casts serious doubt as to the defendant's contention that he did not financially benefit from the bribery scheme. Indeed, it is hard to believe that the defendant

5

financial benefit to the defendant, the effect of his bribery scheme on the integrity of U.S. Army officials, of the U.S. Army's record keeping system and the government procurement process in general remain the same.

With respect to the need for deterrence, the Court's sentence should not only serve to deter the defendant from future crimes, but also serve to deter others. General deterrence, in a case like this one, is very important. See United States v. Mahabeer, 2010 WL 981783, *2 (E.D.N.Y. Mar. 05, 2010) ("General deterrence is critical in the context of corruption among airport employees, and is […] necessary to send a clear message that security at our nation's airports is essential, and that compromising that security for personal grain will result in a substantial prison sentence.") The government procurement process is a massive undertaking that does not have a high level of checks and balances. When such procurements are conducted in a war zone, it is even more difficult to discover fraud and corruption. This fact is well-known amongst the relatively small community of contractors in Afghanistan, where the government maintains a military presence, and in other areas of the world in which the United States relies on private subcontractors to fulfill military supply needs. In Afghanistan and other areas where the U.S. maintains a military presence, there often exists a perception of lawlessness and that corruption and graft is simply part of the process. The government respectfully submits that a sentence within the applicable advisory Guidelines will send a clear message to subcontractors that corruption will result in a substantial prison sentence.

---

would pay bribe money and risk criminal liability to falsify TMRs for other companies without receiving some sort of financial benefit.

6

V. <u>Conclusion</u>

   For these reasons, the government respectfully requests that the Court impose a sentence within the applicable advisory Guidelines range, as it is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a). Further, the government requests that the Court order the defendant to forfeit $54,000, the amount of the bribe money the defendant paid to the Officer and which the defendant agreed to forfeit as part of his plea agreement.

                Respectfully submitted,

                KELLY T. CURRIE
                Acting United States Attorney

          By:    /s    
             Amir H. Toossi
             Assistant U.S. Attorney
             Daniel Butler
             Trial Attorney

cc: The Honorable Margo K. Brodie (by ECF)
   Aaron Shapiro, Esq. (by ECF)